IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| NOMO AGROINDUSTRIAL SA DE CV, ) | No. CV 05-351-TUC-FRZ |
| ) | |
| Plaintiff, ) | **ORDER** |
| ) | |
| vs. ) | |
| ) | |
| ) | |
| ENZA ZADEN NORTH AMERICA, ) | |
| INC., et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____ ) | |

Pending before the Court are the parties' motions in limine.  For the reasons stated below, the motions are granted in part and denied in part.[1]

**I. BACKGROUND**

In 2004, Plaintiff Nomo Agroindustrial ("Nomo") contacted Defendant Enza Zaden ("Enza") to purchase tomato seeds.  Plaintiff is a farming company based in Mexico that grows tomatoes, cucumbers, and other vegetables to be sold in the United States.  Enza is a large, international corporation that manufactures seeds.  When Plaintiff contacted Enza about obtaining tomato seeds, it allegedly informed Enza of problems it had with tomato plants contracting Tomato Spotted Wilted Virus ("TSWV").  Upon informing Enza of its

_____

[1]The Court has determined that the issues have been fully and adequately briefed and that oral argument would not aid the Court in its understanding of the issues.  Thus, the Court finds that the motions can be appropriately resolved without oral argument.

1   concerns and needs, Enza recommended its Caiman variety tomato seed.  In relation to this

2   seed, Enza provided brochures stating that the seed was resistant to TSWV, and Enza also

3   orally informed Plaintiff that the seeds were resistant to TSWV.  Based on these assurances,

4   and after working out the details with Enza, Plaintiff contacted a distributor to pay for and

5   obtain the seeds.  Shortly after obtaining the seeds, Plaintiff planted the seeds and they

6   germinated into tomato plants.  However, the tomato plants allegedly contracted TSWV and

7   Plaintiff's entire Caiman tomato crop was destroyed.  The litigation in this case arises from

8   the destruction of this crop.

9   **II.  GENERAL STANDARDS OF ADMISSIBILITY**

10      As reflected in the motions *in limine*, the parties largely argue that various pieces of

11   evidence are inadmissible as irrelevant or unduly prejudicial.  As such, the relevant rules of

12   evidence are summarized for purposes of reviewing the parties' motions. Fed. R. Evid. 402

13   provides that "all relevant evidence is admissible" and that "evidence which is not relevant

14   is not admissible."  Fed. R. Evid. 401 defines relevant evidence as "evidence having any

15   tendency to make the existence of any fact that is of consequence to the determination of the

16   action more probable or less probable than it would be without the evidence." Fed. R. Evid.

17   403 provides that relevant evidence may be excluded if "its probative value is substantially

18   outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury,

19   or by considerations of undue delay, waste of time, or needless presentation of cumulative

20   evidence."

21   **III.  GENERAL MOTIONS IN LIMINE THAT DO NOT PERTAIN TO EXPERT
        TESTIMONY**

22
     **Nomo's Motion in Limine #2: Exclusion of All References to Limitation of Damages
23   Clauses and Warranty Disclaimers**

24      Nomo seeks to exclude all references to limitation of damages clauses and warranty

25   disclaimers.  The Court previously granted Nomo's cross-motion for summary judgment

26   whereby the Court ruled that the limitation of damages clauses and warranty disclaimers

27   advanced by Enza were invalid and unenforceable.  As such, this issue has already been

28   resolved.  A review of Enza's response to motion in limine #2 reflects that Enza simply

included exhibits and references to limitation of damages clauses and warranty disclaimers to preserve the issue for appeal.  As the Court has already ruled that the limitation of damages clauses and warranty disclaimers previously at issue in this case are invalid and unenforceable, <u>Nomo's motion in limine #2 is granted</u>.  To the extent there is relevant evidence that happens to include references to limitation of damages clauses and warranty disclaimers, such references shall be redacted.

**Nomo's Motion in Limine #3: Exclusion of Evidence Regarding Nomo's Business Practices**

Nomo argues that there has been testimony in the case in regards to Nomo's alleged failures to timely pay some of its bills.  Nomo seeks to exclude any evidence pertaining to its bill paying practices as it is irrelevant to the issues in this case (i.e., whether there was a breach of warranties pertaining to whether the seeds were "resistant" to TSWV, the meaning of "resistant," the amount of Nomo's damages stemming from the lost crop, etc.) and to the extent it has any marginal relevance it should be excluded under Rule 403.  Enza argues that Nomo's cash flow problems and its failure to timely pay bills is relevant to the extent it undermines Nomo's damages claim stemming from the lost crop.  Enza argues that Nomo's economic damages expert implies that Nomo had a profit margin of 75% for the 2004 lost crop.  However, in his report, Enza's economic damages expert attacks this profit claim as overstated and reasons in part that "this profit margin seems unlikely given [Nomo's] testimony of cash flow issues and inability to pay certain vendors."  While Enza's expert thinks the claimed profit margin is unlikely in light of Nomo's cash flow and bill paying problems,  it does not make these issues relevant to determining Nomo's actual damages stemming from the lost Caiman tomato crop in 2004.  The Court finds these issues shall be excluded as they are irrelevant; to the extent they are marginally relevant, they are excludable under Rule 403.  <u>Nomo's motion in limine #3 is granted</u>.

**Enza's Motions in Limine #'s 1 and 2: Exclusion of Statements Made Pursuant to Settlement Negotiations**

In motion in limine #1, Enza seeks to exclude alleged admissions made by Enza executive Vincent Van Bentum made during a settlement negotiation with Nomo's president (Molina).

1    In 2006, during the course of depositions at the offices of Enza's counsel, counsel for Enza
2    approached counsel for Nomo about a Rule 408 meeting between Van Bentum and Molina
3    to discuss a settlement.  The meeting was a private, confidential settlement discussion
4    between Van Bentum and Molina whereby all parties agreed not to have counsel present.
5    During the course of discussions during the confidential settlement meeting between Van
6    Bentum and Molina, Van Bentum allegedly admitted to Molina (Van Bentum denies any such
7    admission) that the seeds in question were in fact infected with TSWV.  Despite the fact that
8    this alleged statement was made during the course of a private, confidential settlement
9    meeting with the approval of the parties' respective attorneys, Plaintiff now seeks to
10   introduce Van Bentum's alleged statement made during the settlement meeting.  Plaintiff
11   argues that this alleged statement is admissible as it is not seeking to introduce the statement
12   to prove liability; Plaintiff asserts that the statement is admissible as it is an unconditional
13   statement of fact bearing on an issue in dispute (i.e., whether the seeds in question were
14   infected with TSWV) and that the statement is admissible to help prove punitive damages.
15        In response, Enza argues that the statement in question obviously falls within the
16   parameters of Rule 408 which prohibits the admission of statements made in the course of
17   settlement discussions.  Rule 408 states in relevant part: "Evidence of the following is not
18   admissible on behalf of any party, when offered to prove liability for . . . a claim: . . .
19   conduct or statements made in compromise negotiations regarding the claim . . . This rule
20   does not require exclusion if the evidence is offered for purposes not prohibited by
21   subdivision (a). Examples of permissible purposes include proving a witness's bias or
22   prejudice; negating a contention of undue delay; and proving an effort to obstruct a criminal
23   investigation or prosecution." Enza argues that despite the pretextual reasons Plaintiff offers
24   for attempting to offer the alleged statement, it is obvious that the alleged admission is
25   directly related to liability in this case as Plaintiff claims would fail if the seeds were never
26   in fact infected with TSWV.  Furthermore, Enza argues that contrary to Plaintiff's assertions,
27   factual statements made during settlement negotiations are clearly within the scope of Rule
28   408's prohibition against admission and admitting such statements would clearly undercut

1   the public policy goals of Rule 408.  *See generally* 2 *Weinstein's Federal Evidence*

2   §408.05[1] and §408.05[2] (2nd Ed., current through 2008)("The most striking feature of Rule

3   408 is its departure from the common-law rule that often admitted conduct occurring, and

4   statements made, during negotiations for compromise . . . The common-law rule was

5   extremely difficult to apply.  The results lacked uniformity and showed a degree of

6   arbitrariness . . . Rule 408 sweeps the boards clean of all this sophistry.  It extends its

7   coverage to all conduct and statements during negotiation.  To promote settlement of

8   disputes, there must be full and frank disclosure by each party of his or her position, and the

9   facts on which he or she relies to sustain that position.  It should be assumed that the law has

10  written over the door of every such conference room the words 'ye who enter here do so

11  without prejudice' . . . The best hope of a satisfactory compromise lies in the confidence of

12  the participants that they can speak freely"); *Id.* at §408.08[1] (stating that while Rule 408

13  does not require exclusion when a statement is offered for some other purpose than proving

14  liability, "care should be taken that an indiscriminate application of this 'exception' to Rule

15  408 does not result in undermining the rule's public policy objective.  The almost

16  unavoidable impact of the disclosure of such evidence is that the jury will consider the offer

17  of agreement as evidence of a concession of liability.  The trial judge should weigh the need

18  for such evidence against the potentiality of discouraging future settlement negotiations, and

19  has broad discretion as to whether to admit evidence of settlement negotiations offered for

20  another purpose.")(internal quotes and citations omitted).

21      The Court finds that the alleged statements made by Van Bentum during the private,

22  confidential settlement negotiations are excludable under both Rule 408 and Rule 403;

23  Enza's motion in limine #1 is granted.

24      Enza's motion in limine #2 also seeks to exclude a statement made pursuant to a

25  settlement discussion.  Shortly after Nomo's crop failure, Nomo's president encountered one

26  of Enza's general managers at an agricultural exposition in Mexico.  The manager from Enza

27  was aware of the crop failure and offered to settle the matter by offering Nomo an $11,000

credit towards future seed purchases.  Nomo seeks to introduce this statement at trial.  The Court also finds that this settlement offer is excludable under both Rule 408 and Rule 403; Enza's motion in limine #2 is granted.

**IV.  MOTIONS IN LIMINE RELATING TO EXPERT TESTIMONY**

**Legal Principles Pertaining to the Admission or Exclusion of Expert Testimony**

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  The rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

When an objection to an expert's testimony is raised, the court must perform *Daubert* gatekeeper duties before the jury is permitted to hear the evidence.  *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999).  A trial court's gatekeeper duty requires two separate inquiries:  the witness must be qualified to offer the opinions he or she is espousing and the proponent of the witness bears the burden of proving by a preponderance of the evidence that its witness' opinions are both relevant and reliable.  *Kumho Tire*, 526 U.S. at 141, 152; *Bourjaily v. United States,* 483 U.S. 171, 175 (1987).

Under the first prong of *Daubert*'s two-prong test for admissibility of expert testimony, "[t]he adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.  The trial court's obligation under Rule 702 and *Daubert* is to determine evidentiary reliability, or trustworthiness. *See id.* at 590 n. 9. Scientific evidence is reliable if it is based on an assertion that is grounded in methods of science--the focus is on principles and methodology, not conclusions. *See id.* at 595-96. The Supreme Court listed four non-exclusive factors for consideration in the reliability analysis:

1    (1) whether the scientific theory or technique can be (and has been) tested; (2) whether the

2    theory or technique has been subjected to peer review and publication; (3) whether a

3    particular technique has a known potential rate of error; and (4) whether the theory or

4    technique is generally accepted in the relevant scientific community. *See id.* at 593-94.   As

5    emphasized in *Kumho Tire,* "the test of reliability is 'flexible,' and *Daubert's* list of specific

6    factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the

7    law grants a district court the same broad latitude when it decides how to determine

8    reliability as it enjoys in respect to its ultimate reliability determination."  *Kumho Tire Co.,*

9    526 U.S. at 141-42.  An expert's testimony may be excluded where it is based on subjective

10   beliefs or unsupported speculation which is no more than unreliable *ipse dixit* guesswork.

11   *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) (holding that trial court may

12   properly exclude *ipse dixit* opinions where "there is simply too great an analytical gap

13   between the data and the opinion proffered"); *Domingo ex rel. Domingo v. T.K.*, 289 F.3d

14   600, 607 (9th Cir. 2002) (affirming the exclusion of the *ipse dixit* testimony of plaintiff's

15   expert that was not based upon objective, verifiable evidence).

16       Rule 702's second prong concerns relevancy, or "fit." *See Daubert*, 509 U.S. at 591. The

17   scientific knowledge must be connected to the question at issue. *In re Paoli R.R. Yard PCB*

18   *Litig.*, 35 F.3d 717, 745 (3d Cir.1994), *cert. denied sub nom.*, *General Electric Company v.*

19   *Ingram*, 513 U.S. 1190 (1995). The trial court "must ensure that the proposed expert

20   testimony is 'relevant to the task at hand,' ... i.e., that it logically advances a material aspect

21   of the proposing party's case." *Daubert II*, 43 F.3d at 1315.  "[T]he standard for fit is higher

22   than bare relevance." *In re Paoli*, 35 F.3d at 745. Scientific expert testimony introduces

23   special dangers to the fact-finding process because it "can be both powerful and quite

24   misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595 (internal

25   quotation marks and citation omitted). Therefore, federal judges must exclude proffered

26   scientific evidence under Rule 702 unless they are convinced that it speaks clearly and

27   directly to an issue in dispute in the case, and that it will not mislead the jury. *Daubert II*, 43

28   F.3d at 1321.

However, the Court's *Daubert* gatekeeper function does not replace the role of the factfinder.  Indeed, the district court is not to "evaluate the credibility of opposing experts and the persuasiveness of competing scientific studies[.]"  *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003), *quoting Ambrosini v. Labarraque*, 101 F.3d 129, 141 (D.C.Cir. 1996).  The jury is entitled to hear expert testimony and decide whether to accept or reject it after considering whether predicate facts on which the expert relied were accurate.  *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239 (11th Cir. 2002). As such, the Ninth Circuit has emphasized:

> Judges in jury trials should not exclude expert testimony simply because they disagree with the conclusions of the expert.  The *Daubert* duty is to judge the reasoning used in forming an expert conclusion.  The test is whether or not the reasoning is scientific and will assist the jury.  If it satisfies these two requirements, then it is a matter for the finder of fact to decide what weight to accord the expert's testimony.  In arriving at a conclusion, the fact finder may be confronted with opposing experts, additional tests, experiments, and publications, all of which may increase or lessen the value of the expert's testimony.  But their presence should not preclude the admission of the expert's testimony–they go to the weight, not the admissibility.

*Kennedy v. Collagen Corporation*, 161 F.3d 1226, 1230-31 (9th Cir. 1998).  A district court's decision pertaining to the admissibility of expert testimony is reviewed for an abuse of discretion.  *See U.S. v. Rahm*, 993 F.2d 1405, 1410, 1412 (9th Cir. 1993)(emphasizing that "[c]ertainty is an unreasonable expectation in the realm of expert opinion. [An expert's] use of the conditional 'could' in expressing her conclusion is neither unusual nor disqualifying as to her testimony.  In any area of science . . . expecting an expert to reach a conclusion without the slightest doubt as to its accuracy is exceedingly unrealistic.  Experts ordinarily deal in probabilities, in 'coulds' and 'mights' . . . It is the rare expert who is willing to opine conclusively about a past occurrence.")

**Nomo's Motion in Limine #4: Exclusion of Tests Pertaining to Frozen Plant Samples**

Nomo argues that testing done by Enza's experts on frozen plant samples from Nomo's 2004 tomato crop is unreliable.  To support this contention, Nomo cites to general statements made by various Enza experts that optimal temperatures to store frozen plant samples for

1   testing is somewhere between negative 20 degrees Centigrade and negative 173 degrees
2   Centigrade, and that the failure to store frozen samples at these temperatures may result in
3   degradation of plant samples and impact the reliability of testing for viruses.  Nomo argues
4   that for approximately 15 months (December of 2004 to Spring of 2006) the frozen plant
5   samples at issue were stored in a conventional home freezer at the dwelling of one of Nomo's
6   employees.  Nomo argues the standard temperature for home freezers is approximately 0
7   degrees Fahrenheit which equates to negative 18 degrees Centigrade.[2]

8       Nomo argues that during the 15 months at issue, it had no reason to believe that frozen
9   samples should be stored somewhere between negative 20 degrees Centigrade and negative
10  173 degrees Centigrade.  Nomo argues that it had no intention of storing the frozen samples
11  at improper temperatures.  Nomo emphasizes that Nomo and Enza both had full access to
12  fresh samples, and tested as many fresh samples as each found necessary when the problems
13  were initially discovered in 2004.  In addition, Nomo argues that Enza had full access to
14  obtain as many fresh plant samples as it wanted, and could have and should have taken extra
15  samples and properly frozen as many samples as it desired in light of the obvious potential
16  for litigation in 2004 regarding the TSWV allegations.  Nomo argues that it can not be
17  faulted for Enza's failure to obtain fresh samples to freeze at proper temperatures such that
18  these frozen temperatures could be subjected to additional testing at a future time in light of

19

20          [2]Nomo cites to deposition testimony from Enza's expert, Karin Postuma, whereby she
21  recognizes that the samples at issue were stored in a home freezer and the temperatures in typical
    home freezers are normally between negative 15 degrees and negative 20 degrees Centigrade.
22  Nomo also argues that the standard temperature for typical freezers, which is 0 degrees Fahrenheit/-
    18 degrees Centigrade, is a fact subject to judicial notice pursuant to F.R.E. 201.  *See* F.R.E. 201(b)
23  ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1)
    generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and
24  ready determination by resort to sources whose accuracy cannot reasonably be questioned.") The
    Court declines to address whether judicial notice is appropriate at this time as it is likely
25  unnecessary.  It appears that there is deposition testimony that generally reflects on this issue and
    it would also seem that live witnesses, including Enza's experts, would be willing to concede what
26  the typical temperature setting is for home freezers.  If necessary, this issue can be revisited at trial
27  and Plaintiff should be prepared with necessary information/documentation to show that such fact
28  is appropriate for judicial notice.

1   the obvious potential for litigation.  Regardless, the fact remains that Nomo argues that

2   testing on the frozen samples is unreliable as they were stored in a home freezer at

3   approximately negative 18 degrees Centigrade while various Enza experts generally

4   acknowledged that frozen samples should optimally be stored at lower temperatures to

5   prevent degradation of samples that could impact testing for viruses.

6       Nomo argues that the frozen samples were likely stored at warmer temperatures at certain

7   times due to consistent opening and closing of the freezer, defrost cycles, power outages,

8   warmer temperatures while samples were in transport, etc. While Plaintiff can clearly raise

9   these issues to generally attack the credibility of the evidence offered by Enza's experts

10  pertaining to testing on frozen samples, the Court finds that exclusion of such evidence is not

11  appropriate.[3]  While Nomo points to typical temperatures in home freezers, there is nothing

12  in the record indicating what the actual temperature was kept at in the freezer in question,

13  why slightly lower temperatures would make such a drastic difference pertaining to samples,

14  or why these samples were in such a degraded state such that any testing was unreliable.

15  Despite the general statements regarding proper freezing temperatures, there is no testimony

16  from Enza's experts or Plaintiff's experts that the specific testing done on the specific frozen

17  samples in question was in fact flawed, or that the samples were in fact in such a degraded

18  state that they could not be appropriately tested for viruses such as the ones discovered by

19  Enza's experts (i.e., Tomato Yellow Leaf Curl Virus-"TYLCV" and Tomato Apex Necrosis

20  Virus-"TANV".).  Enza has also submitted evidence from its expert stating that the frozen

21  samples that they actually obtained from the freezer of Nomo's employee were frozen solid,

22  that they were in good condition, that the samples were appropriate for testing, and that the

23  tests eventually done on the samples were accurate and reliable despite the allegations

24  pertaining to improper freezing temperatures.  For example, Enza's expert states that had the

25  _____

26      [3]While the Court agrees with Enza that it should be entitled to present all of its evidence
    pertaining to testing on frozen plant samples, the Court rejects Enza's argument that Nomo should
27  be prevented from raising these issues at trial because Nomo intentionally spoliated evidence, that
    Nomo shouldn't benefit from its intentional spoliation, and that Enza wasn't on notice that it should
28  have obtained and properly stored its own set of frozen samples.

1   samples actually degraded to the point of unreliability, the reverse-transcriptase polymerase

2   chain reaction test ("PCR") should not have detected the DNA sequence of TYLCV and the

3   RNA sequence of TANV; the fact that the tests were able to detect these DNA/RNA

4   sequences indicates that the samples were not in degraded states such that testing on them

5   would have been unreliable.  In light of the foregoing, Nomo's motion in limine #4 is denied.

6   **Nomo's Motion in Limine #5: Exclusion of Testing for TANV**

7       In motion in limine #5, Nomo argues that testing related to TANV should be excluded for

8   two reasons.[4]  First, Nomo argues that Enza's supplemental disclosures pertaining to test

9   results for TANV were disclosed after the expiration of the expert disclosure deadline set in

10  the Court's scheduling order.  However, as Enza correctly points out, the parties worked

11  together in this case in obtaining numerous stipulations to extend deadlines, both parties

12  informally continued to conduct expert related discovery after official deadlines, Nomo was

13  on notice that Enza would be conducting new testing related to the new virus, and Nomo had

14  sufficient time and opportunity to designate a rebuttal expert pertaining to the TANV testing

15  but chose not to do so.  As such, the Court declines to exclude Enza's testing pertaining to

16  TANV on the grounds that it fell outside the time limit in the Court's Scheduling Order.

17      Second, Nomo also generally argues that testing pertaining to TANV is unreliable because

18  it was in its genesis at the time Enza's experts tested for TANV in July of 2007, that the tests

19  have not been subjected to appropriate peer review, that the tests could turn out to have high

20  error rates, and that Enza's experts may not have adequate experience to reliably conduct

21  TANV testing.  While Nomo makes these general assertions because TANV testing is quite

22  new, it has not pointed to anything in the record demonstrating that the actual testing

23  conducted by Enza's experts in this case was unreliable.  Enza emphasizes that its expert has

24  extensive training and experience in identifying new and emerging plant viruses, that the

25  entire genome sequence for TANV has actually been identified independently by numerous

26

27      [4]Nomo also argues that the frozen samples used for TANV testing were unreliable; as the Court already rejected this argument pertaining to Nomo's motion in limine #4, there is no need to

28  address this issue again.

scientists and organizations, and that TANV has been officially recognized in the scientific community.  Furthermore, Enza argues that the reverse-transcriptase polymerase chain reaction test it used to detect the RNA sequence of TANV has long been used and accepted by the scientific community to detect plant viruses, and the actual testing in this case was appropriately conducted to detect TANV.  The Court finds that the testing pertaining to TANV is reliable and therefore <u>Nomo's motion in limine #5 is denied</u>.

**<u>Enza's Motions in Limine #3 (Preclude Testimony from Dr. Jensen) and #4 (Preclude Testimony from Mexican Farmers Iberri and Llano)</u>**

One of the issues in this case is the meaning of "resistant" as it pertains to the resistance a seed has to particular viruses.  Enza argues that the proper definition is one advanced by an international seed federation.  Nomo argues that Enza never defined resistant in materials provided to Nomo in relation to the seeds it purchased that were supposed to be resistant to TSWV, that the definition advanced by Enza is generally an unknown and unaccepted hyper-technical definition of resistant, and that the definition of resistant has been subject to differing and unclear definitions.  Nomo also argues that Mexican farmers believe the term resistant to be synonymous with immune; in relation to this issue, Nomo seeks to introduce testimony from Dr. Merle Jensen whereby he seeks to testify about what farmers across the world understand "resistant" to mean.  As Enza correctly argues, while Dr. Jensen has advanced degrees in plant sciences, is a professor of plant sciences at the University of Arizona, and has worked with many farmers throughout the world over the last 40 years in the industry, he simply has no reliable basis whatsoever for his proposed testimony.

His expert report states in relevant part: "When farmers see seed catalogs and/or when seed salesmen express seed cultivars (varieties) as 'resistant', they [i.e., all farmers] believe that the plants are free of any possibility of becoming diseased.  In my many years working with farmers throughout the world, it has been my experience that they [i.e, all farmers] define resistant as the seeds being immune to said disease.  In other words, to the farmer, *immunity* and *resistance* are synonymous."   A review of Dr. Jensen's deposition clearly shows that he has no reliable basis to make these statements as to what all farmers believe

1   "resistant" to mean.  A review of Dr. Jensen's deposition reveals that he could not provide

2   the names of any farmers who he discussed this issue with, he has conducted no research on

3   this issue to reach his conclusion, he has not written any article or paper concerning this

4   issue, has not engaged in any type of methodical process to reach his conclusion, and has not

5   explained why his experience/expertise reflects why he can reliably state what all farmers

6   believe "resistant" to mean.  *See generally* Advisory Committee Notes (2000 Amendments)

7   to F.R.E. 702 ("If the witness is relying solely or primarily on experience, then the witness

8   must explain how that experience leads to the conclusion reached, why that experience is a

9   sufficient basis for the opinion, and how that experience is reliably applied to the facts. The

10  trial court's gatekeeping function requires more than simply 'taking the expert's word for

11  it.'").  Dr. Jensen does not even attempt to define a specialized industry term, such as

12  "resistant," based on his advanced education and many years of experience in the industry;

13  this could be appropriate expert testimony.  Rather, Dr. Jensen purports to testify as to what

14  all farmers around the world (including Mexico which is at issue in this case) believe the

15  term "resistant" to mean.  As Dr. Jensen's deposition testimony reflects that he has no

16  reliable basis to offer an expert opinion as to what all farmers believe "resistant" to mean,

17  any testimony from Dr. Jensen as to this issue is precluded at trial.  <u>Enza's motion in limine</u>

18  <u>#3 is granted</u>.

19      Similar to motion in limine #3, motion in limine #4 also seeks to exclude testimony

20  pertaining to what all Mexican farmers believe "resistant" to mean.  Nomo seeks to introduce

21  the testimony from two experienced Mexican farmers (Iberri and Llano) who have been

22  farming in Mexico for decades.  These two farmers offer testimony as to what they

23  personally understand "resistant" to mean and what other Mexican farmers understand

24  "resistant" to mean.  Like Dr. Jensen, Iberri and Llano simply have no reliable basis to offer

25  testimony as what other Mexican farmers believe "resistant" to mean and Nomo has not even

26  attempted to designate them as experts to testify as to what all other Mexican farmers

27  believe; as such, Enza's <u>motion in limine #4 is granted in part</u> to the extent that any

28  testimony from Iberri and Llano that purports to state what other Mexican farmers believe

1  "resistant" to mean is precluded.  However, Enza's <u>motion in limine #4 is denied in part</u> to

2  the extent that the Court finds that Iberri and Llano can offer testimony as to how they

3  personally understand the term "resistant" and why they define or understand the term

4  "resistant" in a particular way; this testimony is relevant and its relevance is not outweighed

5  by Rule 403 considerations.

6  **Enza's Motion in Limine #5: Preclude References to Nomo's 2003 Caiman Tomato Crop Loss**

7  Nomo seeks to introduce testimony at trial reflecting that Nomo obtained a relatively small

8  batch of Caiman tomato seeds from Enza in 2003 and that these tomato seeds allegedly

9  contracted TSWV resulting in destruction of the crop.  The 2003 crop is not at issue in this

10  case.  This case concerns a separate, large batch of Caiman tomato seeds obtained from Enza

11  in 2004 that allegedly contracted TSWV resulting in the destruction of the entire crop.  Nomo

12  argues that it should be permitted to offer such testimony as it is important background

13  information leading up to discussions between Nomo and Enza in 2004 regarding resistance

14  of Enza's Caiman tomato seeds to TSWV.  However, it appears that the only person that

15  would be offering testimony that the 2003 crop was infected by TSWV would be Nomo's

16  president (Molina); Nomo's response to Enza's motion in limine attached Molina's

17  deposition testimony regarding this issue.  A review of that deposition testimony reflects that

18  Molina noticed some problems with the 2003 crop and was not aware of the cause of the

19  problems with the crop based on his own experience; rather, he ultimately sent a sample of

20  the crop to Dr. Verdugo who later informed Molina over the phone that the crop was infected

21  with TSWV.  Testimony from Molina regarding whether the 2003 crop was infected with

22  TSWV is not within the realm of permissible lay testimony.  *See* Rule 701.[5]  Furthermore,

23  

24  
_____

25  [5]Rule 701 states: "If the witness is not testifying as an expert, the witness' testimony in the

26  form of opinions or inferences is limited to those opinions or inferences which are (a) rationally
based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony

27  or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized
knowledge within the scope of Rule 702."

28

1   Molina is not in a position to offer expert testimony under Rule 702[6] that the 2003 crop was

2   infected with TSWV.  In addition, Nomo admits that they have no expert report and are not

3   offering any expert testimony under Rule 702 that the 2003 crop was infected with TSWV.

4   Thus, as the record before the Court stands, it does not appear that Nomo has a legitimate

5   basis for offering testimony that the 2003 crop was indeed infected with TSWV.  Thus,

6   Enza's motion in limine #5 is granted.[7]  On a related note, while Nomo can not specifically

7   state that the 2003 crop was infected with TSWV, it appears that some very general

8   testimony pertaining to Nomo's general concerns about TSWV may be necessary to give the

9   jury adequate background and context in analyzing the case.  Nomo's concerns about TSWV

10  led to specific inquiries of Enza and alleged assurances pertaining to resistance of the 2004

11  seeds to TSWV.  This issue can be further addressed at trial if and when the issue arises.

12  **Enza's Motion in Limine #6: Preclusion of Any Reference to TSWV Isolates**

13      Enza seeks to prevent Nomo from making any reference to the fact that there have been

14  isolates or strains of TSWV that have infected tomato plants with TSWV despite the

15  presence of the Sw5 gene in the subject tomato plants.  Enza has argued throughout this case

16  that if a tomato plant has the Sw5 gene it is in fact resistant to TSWV and that it is properly

17  marketed as resistant to TSWV in general.  Enza argues that Nomo can not reference any

18  _____

19      [6]Rule 702 states: "If scientific, technical, or other specialized knowledge will assist the trier
    of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by
20  knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion
    or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the
21  product of reliable principles and methods, and (3) the witness has applied the principles and
    methods reliably to the facts of the case."
22

23      [7]The Court notes that Enza's request for a limiting instruction on this issue is moot as Enza's
    motion has been granted; the issue can be raised again at trial if it becomes necessary.  The Court
24  also notes that Enza seems to suggest that testimony pertaining to Nomo's "belief" that the 2003
    crop was possibly being infected with TSWV "may very well be admissible at trial" pertaining to
25  whether Nomo reasonably relied on assurances by Enza that the 2004 seeds were resistant to TSWV.
    As the Court has already granted Enza's motion excluding references to this issue, Enza likely
26  would not be permitted to raise this issue at trial.  To the extent Enza seeks to introduce this issue
    at trial, the Court would have to address anew whether Nomo would be permitted to explain why
27  it believed the 2003 crop was infected with TSWV.

28

1   TSWV isolates that were unaffected by the Sw5 gene because it has no expert that
2   specifically testifies that a specific TSWV isolate actually broke through the Sw5 genes in
3   Nomo's 2004 tomato seeds purchased from Enza.  Enza also argues that evidence regarding
4   TSWV isolates breaking though any Sw5 resistance is not reliable because Nomo has no
5   expert to testify regarding specific TSWV isolates affecting the 2004 crop, that there is no
6   specific evidence of a TSWV isolate being identified in Mexico, and that just because a
7   TSWV isolate broke through Sw5 genes on limited occasions in the past does not mean the
8   seeds at issue that had Sw5 genes were not resistant to TSWV.  Lastly, Enza argues that any
9   reference to TSWV isolates not being affected by Sw5 genes should be excluded based on
10  Rule 403 considerations because a jury may improperly conclude that because TSWV
11  isolates broke though Sw5 resistance in the past that this could have been the circumstances
12  in this case as well.

13  As Nomo correctly argues, however, three separate scientists tested three separate batches
14  of samples from the 2004 Caiman tomato crop on three separate occasions-all of them found
15  the presence of TSWV in the samples from Nomo's destroyed tomato crop.  As the tomato
16  seeds at issue had the Sw5 gene, and three scientists (one of the scientists was one engaged
17  by Enza to test for TSWV) nonetheless found TSWV in three separate batches of samples
18  from the destroyed tomato crop, Nomo argues that a jury obviously has enough to find either:
19  (1) that the seeds manufactured by Enza with the Sw5 gene that were sold to Nomo were not
20  resistant to any strain of TSWV; or (2) that the seeds were infected with a strain of TSWV
21  (a new strain or isolate of TSWV is still considered TSWV) that is not affected by the Sw5
22  gene.  In light of the foregoing, Nomo argues that it is not necessary to have one of their own
23  experts testify as to a specific isolate affecting the 2004 tomato crop especially in light of the
24  fact that Enza's own employees and experts disclosed scientific articles and made numerous
25  admissions stating that they were aware of instances of TSWV isolates breaking through the
26  Sw5 resistance to infect tomato plants with TSWV since at least the 1990's.

27  Representatives of Enza acknowledged that they were aware of scientific literature and
28  were otherwise informed that some strains of TSWV were unaffected by the Sw5 gene.

1    Enza's representatives acknowledged TSWV isolates breaking through the Sw5 resistance

2    in at least Hawaii and Spain in the 1990's.  For example, Frits Herlaar was questioned about

3    a scientific report pertaining to TSWV strains breaking through the Sw5 resistance during

4    his deposition, and he acknowledged that the authors of the scientific report were "credible."

5    Herlaar Deposition at 72-73.  He was questioned about a passage in the report that states

6    "The resistance conferred by the Sw5 gene, which relies on the development of a

7    hypersensitive response no longer constitutes a durable resistance system against the

8    disease."  *Id.* at 73.  Herlaar acknowledged that the Sw5 gene is susceptible to the extent

9    "resistance is overcome by certain isolates in certain areas," but countered that Sw5 has been

10   resistant for a great many years in most common areas where tomatoes are grown so it is

11   nonetheless very durable.   Shortly thereafter, the following exchange occurred during

12   Herlaar's deposition:

13         Q: Is it your understanding that isolates of TSWV in all regions of the world - in all
           regions of the world, isolates of TSWV have developed that are not affected by the
14         Sw5 gene? . . .
           A: It's true that there is an occurrence of isolates that are breaking through the resistance;
15         but on the other hand, those isolotes doesn't [sic] seem to be vital to survive long term.
           So they disappear again . . . it's not vital enough to sustain the market.
16         Q: How do you know it's not been vital enough to sustain the market?
           A: Because it's - disappeared.  It's not found to be a problem for growers.
17          Q: Could it turn up again?
           A: Yes.
18         Q.  TSWV is a virus that is very good at evolving and developing new isolates; is that
           right?
19         A: Yeah.
           Q: And so it's possible that TSWV could continue to develop new isolates that are not
20         affected by the Sw5 gene?
           A: Yes sir.
21
       *Id.* at 74-75.
22

23   Nomo correctly emphasizes that evidence of TSWV isolates breaking through Sw5

24   resistance prior to 2004 is obviously highly relevant to its claims of fraud and

     misrepresentation as Nomo maintains that Enza improperly listed the seeds at issue as
25
     resistant to TSWV in general when it in fact knew that there were strains of TSWV that were
26
     totally unaffected by the Sw5 gene since the 1990's.  The highly relevant nature of this
27

28

1  evidence outweighs any Rule 403 considerations.  In light of the foregoing, <u>Enza's motion</u>

2  <u>in limine #6 is denied</u>.

3  **<u>Enza's Motions in Limine #'s 7, 8, 9: Drs. Garcia, Verdugo-Gamez, Torres-Pacheco</u>**

4       Enza's motions in limine #'s 7-9 are very similar and seek to exclude Plaintiff's

5  designated experts who performed tests on Nomo's 2004 tomato plants which revealed the

6  presence of TSWV.  First, it should be noted, that none of these experts will be offering live

7  testimony at trial.  Rather, only the brief written documents produced by these experts and

8  portions of their brief deposition testimony will be offered at trial.   Enza offers various

9  general criticisms of these experts pertaining to the testing procedures of the plant samples

10 in question.  For example, Enza argues that these tests were not exhaustive as to viruses,

11 there was inadequate documentation pertaining to the testing, that photos were not taken of

12 samples/results, there were inadequate controls, inadequate chain of custody, experts had

13 inadequate experience with testing of tomatoes versus other plants, that tests could not be

14 replicated/duplicated due to inadequate documentation, that there could have been false

15 positives, etc.  However, Enza has not shown how such criticisms actually undermine the

16 reliability of the testing at issue such that they must be excluded under the circumstances of

17 this case.

18    All of the experts at issue have advanced degrees pertaining to plant pathology and have

19 extensive experience pertaining to testing and detecting viruses in plants.  Furthermore, all

20 of the experts testified that they performed very simple, step-by-step tests produced by a well

21 respected company in the field (Agdia).  The tests are widely accepted and one simply

22 follows the directions provided with the tests which involves, in part,  the application of

23 chemical agents to plant samples and there is a change in coloration indicating the presence

24 of TSWV.  The tests are approximately 99% accurate and Enza's own experts also used these

25 same tests.  Upon independently performing these simple tests on three separate occasions

26 on three separate batches of samples from the destroyed crop, the three experts each

27 independently found that the tests indicated the presence of TSWV in the plant samples

28 provided from the 2004 Nomo Caiman tomato crop.  The Court finds that the documentation

1   and deposition testimony pertaining to the testing of the relevant plant samples and

2   corresponding positive results for TSWV pertaining to these samples are admissible; Enza's

3   general criticisms pertaining to these experts goes to the weight, as opposed to the

4   admissibility, of the evidence at issue.

5       Enza also argues that all of the evidence surrounding the testing done by these experts

6   which found TSWV should be excluded because their testing was not exhaustive to the

7   extent the tests failed to account for other possible viruses that could have damaged the crop

8   such as Tomato Yellow Leaf Curl Virus ("TYLCV") and Tomato Apex Necrosis Virus

9   ("TANV"). Enza's experts did not find TSWV in their samples from the 2004 tomato crop,

10  but did find TYLCV and TANV which they argue is the true cause of the destruction of the

11  crop. As Nomo's experts did not account for the universe of other possible viral causes that

12  could have destroyed the crop, Enza argues that the brief documents pertaining to the tests

13  and deposition testimony must be excluded as they are unreliable as to the actual cause of the

14  destruction of the 2004 tomato crop.

15      As a threshold matter, Enza seems to be attacking the documentation pertaining to the tests

16  and deposition testimony of the three experts on grounds that were not within the scope of

17  what the three experts were engaged to specifically address. The Court has reviewed the

18  documentation regarding the tests and the deposition excerpts submitted by the parties. A

19  review of the relevant records shows that the three experts were simply  given samples of the

20  2004 tomato plants, asked to test for the presence of TSWV, they performed simple tests that

21  indicated the presence of TSWV in those samples, and they reported those results in brief

22  documents. The documents at issue simply report the results of the simple tests performed;

23  they do not purport to offer any expert opinion as the actual cause of the damage for the

24  entire 2004 Caiman tomato crop.  Enza's argument that these experts did not account for

25  other causes does not make their simple testing, documents reporting the results of that

26  simple testing and deposition testimony regarding the simple testing unreliable.  The record

27  reflects that it is possible for more than one virus to infect a plant at one time, that a plant can

28  be infected by one virus and then subsequently infected by another virus, and that the various

1   experts all tested different plant samples at different times.[8]  Thus, while Enza's experts may

2   have detected TYLCV and TANV in their samples of the 2004 tomato crop, that does not

3   mean that Nomo's three experts could not have reliably detected the presence of TSWV in

4   their three separate tests of the samples they received of the 2004 tomato crop.  Nomo would

5   obviously have a stronger case if they had a typical, lengthy, detailed expert report,

6   corresponding deposition testimony, and a live expert to testify at trial that actually analyzed

7   all possible viruses that could have damaged the crop and analyzed why TSWV was the only

8   virus that could have possibly damaged the crop.  As far as the Court can tell from the record,

9   Nomo does not have this.  Rather, they have three separate experts who independently

10  performed simple tests on plant samples from the 2004 tomato crop; the documents produced

11  by the expects reflect the results of those tests which indicated the presence of TSWV from

12  those samples.  The fact that these experts were not engaged to exhaustively address and

13  analyze causation and the fact that Nomo has no expert to do so is something that Enza can

14  attack at trial; however, this does not make the simple tests performed and the results

15  therefrom unreliable.

16      Rather, Nomo can argue that TSWV destroyed their crop based on the evidence available

17  and the jury can put the evidence together from both sides to decide the factual question as

18  to what actually caused the destruction of the crop.  Nomo obviously can not argue that their

19  experts exhaustively addressed all possible viral causes that could have possibly destroyed

20  the crop (including TYLCV and TANV) and thereafter came to the conclusion that TSWV

21  was the only possible cause for the damage to the 2004 crop.  However, they can argue that

22  three separate experts (Dr. Garcia, Dr. Verdugo-Gamez, Dr. Torres-Pacheco), on three

23  separate occasions, tested three separate batches of samples of tomato plants from the 2004

24  crop and those tests revealed the presence of TSWV in those samples.  In addition, they can

25

26      [8]Nomo argues that once it was confirmed that TSWV had infected the samples of the 2004

27  crop, it found that it was pointless to continue engaging in regular protective measures (i.e., spraying insecticides, etc.) to further protect the plants from other insects that could have been carrying

28  viruses that could have subsequently infected the already damaged crop.

point out that one of those experts (Dr. Garcia) was actually an expert  engaged by Enza to test for TSWV in a sample from the 2004 crop, that Dr. Garcia found that TSWV was present in the sample, and that Enza initially directed Dr. Garcia not to disclose his test results to Nomo.  Nomo can also point out that Dr. Verdugo-Gamez actually came out to observe the crop shortly after Nomo noticed a problem with the crop, that Dr. Verdugo-Gamez observed symptoms in 10-15% of the crop consistent with TSWV, and that his test (like the other two experts) confirmed the presence of TSWV in the samples he obtained.  In addition, Nomo can point out that the other two experts noticed symptoms on their plants consistent with TSWV, that Dr. Verdugo-Gamez (along with other experts) recognized that the symptoms of TYLCV are nothing like the symptoms of TSWV, and that Enza's own renowned expert (Dr. Garzon) initially observed the symptoms of the crop and determined that a TYLCV test was not necessary.  In addition, Nomo can point out that the other virus, TANV, was not even known of and there was no test available to confirm the presence of TANV in 2004. In addition, there will be evidence in the record establishing the symptoms of TSWV, and Nomo will likely present the testimony of one or more employees who can describe what most or all of the crop eventually looked like which presumably will be consistent with TSWV.

Enza, on the other hand, can obviously attack all of this evidence, including the narrow scope of the experts at issue, and offer its own evidence which includes experts that will testify that they did not find the presence of TSWV in their samples, but only found TYLCV and TANV which was the true cause of the destruction of the entire crop.  A jury could believe all of Enza's evidence, fully accept their criticisms of Nomo's evidence, and reject all of Nomo's evidence.  Likewise, a jury could reject all of Enza's evidence, reject their criticisms of Nomo's evidence, and accept all of Nomo's evidence.  A jury is entitled to consider, weigh, make reasonable inferences, and otherwise accept or reject the evidence at issue as it deems appropriate as to the factual question of what caused the damage to Nomo's 2004 tomato crop.

1    In light of the foregoing, <u>Enza's motions in limine #'s 7, 8, and 9 are denied</u>.  However,

2  as referenced above, Nomo obviously can not argue that their experts exhaustively addressed

3  all possible viral causes that could have possibly destroyed the crop (including TYLCV and

4  TANV) and thereafter came to the conclusion that TSWV was the only possible cause for

5  the damage to the 2004 crop as this was clearly outside of the scope of what the three experts

6  were asked to address.

7  **Exclusion of the Parties' Respective Economic Experts: Enza's Motion in Limine #10**
   **(Coleman) and Nomo's Motion in Limine #1 (Schwickerath)**

8
9    Enza seeks to exclude the testimony of Nomo's economic expert (CPA Robert Coleman)

10  pertaining to damages Nomo allegedly suffered stemming from the loss of its 2004 Caiman

11  tomato crop.  In general, Coleman found that Nomo lost approximately $1 million in lost

12  profits based on the consideration of three basic factors and simple arithmetic in combining

13  these numbers: (1) the price the tomato crop would likely get when it arrived at market

14  during a specific time frame; (2) the amount, in pounds, of the tomato crop that would come

15  to market; and (3) the time frame when the tomatoes would come to market - the price of

16  tomatoes fluctuates and different prices prevailed during different times.  As to the prevailing

17  prices of tomatoes during specific times, Coleman obtained these numbers from the U.S.

18  Department of Agriculture and Enza does not dispute the propriety of this information.

19  However, as to the amount of tomatoes that would come to market and the time frame when

20  they would come to market, Enza argues that information supporting these facts is totally

21  unreliable because much of it came directly and solely from oral deposition testimony from

22  Nomo's president (Molina) or from discussions with Molina, that Molina did not provide

23  adequate written documentation to support the numbers he provided (i.e., past and present

24  tax returns, general ledgers, audited financial statements, etc.), and that Coleman did not

25  independently verify the efficacy of the numbers provided by Molina.  Enza argues that

26  Coleman should have independently verified the pertinent information via written

27  documentation or otherwise verified that the numbers provided were in line with past

28  performance of Nomo or other similarly situated Mexican farmers bringing similar crops to

1    market.  Accordingly, Enza argues that Coleman's testimony is unreliable and must be
2    excluded.

3        In contrast, Nomo argues that there is nothing unreliable about an expert incorporating
4    information into his expert opinion which is provided directly by the injured party.  Nomo
5    argues that Molina, the president of Nomo, is in fact the person in the best position to
6    actually provide the foundational information regarding Nomo's injuries such that Coleman
7    could incorporate this information into his analysis.  Thus, Nomo argues that Coleman
8    appropriately relied on detailed sworn deposition testimony, documents and conversations
9    from Molina regarding Nomo's damages in forming his opinion; Nomo further argues that
10   it will go into great detail at trial in establishing a foundation for the damages at issue in this
11   case.

12       The Court finds that Enza's arguments go to the weight, as opposed to the admissibility,
13   of Coleman's testimony; Enza's motion in limine #10 is denied.

14       Similar to Enza's arguments, Nomo's motion in limine #1 seeks to exclude testimony from
15   Enza's economic expert (i.e., David Schwickerath) because his opinion is unreliable as it is
16   based upon insufficient and unverifiable data.  For example, Schwickerath's damages
17   assessment includes an estimate that Nomo lost approximately 639,000 pounds of tomatoes
18   (which is half the amount Nomo claims).  Nomo argues that this estimate is based only on
19   the production records from a single Mexican farm that grew Caiman tomatoes in 2004, that
20   Schwickerath failed to compare the pertinent farms production with the production of other
21   growers, and that Schwickerath otherwise did nothing to independently verify the production
22   records he received.  Nomo also argues that Schwickerath opinions regarding harvesting
23   practices and when the tomatoes could have been brought to market also are based on the
24   same, single Mexican farm and have no comparison to Nomo's harvesting and timing of the
25   harvest.

26       Enza argues, however, that Schwickerath was retained as an expert to rebut Coleman's
27   baseless economic analysis.  Schwickerath offers two opinions: (1) that Coleman's analysis
28   is unreliable as it is based primarily on the unverifiable information provided by Molina, and

1   alternatively (2) comparing crop production records and data from a typical Mexican farm

2   in the Obregon area (i.e., the same area as Nomo) growing Caiman tomatoes in 2004 shows

3   that Nomo's damages are much less than claimed.  Enza argues that Nomo only attacks the

4   alternative analysis offered by Schwickerath and that this alternative analysis is reliable and

5   admissible at trial.  Enza argues that Schwickerath appropriately relied upon production

6   records from a nearby Mexican farmer that actually documented the amount of Caiman

7   tomato crops he grew and when they were harvested and brought to market.  Furthermore,

8   Enza argues that this information was appropriately gathered by Enza's Mexican

9   representatives who have contacts with many Mexican growers, are personally familiar with

10  the farming habits of these numerous growers, and appropriately determined that the sample

11  farm at issue (owned by Francisco Cinco) was representative of other growers in Obregon.

12  In addition, Enza argues that Swickerath's damages analysis also appropriately relied upon

13  pricing comparisons for various vegetables coming to market, the depositions of Nomo's

14  representatives, Mexico Tomato and Products Annual Report, and the Risk Management

15  Association Annual Statement Studies.

16      The Court finds that Nomo's arguments go to the weight, as opposed to the admissibility,

17  of Schwickerath's testimony; Nomo's's motion in limine #1 is denied.

18  **V.  CONCLUSION**

19      Accordingly, IT IS HEREBY ORDERED as follows:

20  (1) Enza's and Nomo's motions in limine (Doc. #'s 191-205) are granted in part and denied

21  in part as discussed in the text of this Order.

22

23      DATED this 29th day of January, 2009.

24

25

26                                                    Frank R. Zapata

27                                              FRANK R. ZAPATA
                                                United States District Judge

28